581 F.2d 870
 189 U.S.App.D.C. 92
 UNIFICATION CHURCH a/k/a Holy Spirit Association for the
Unification of World Christianity, Appellant,
v.
The ATTORNEY GENERAL FOR the UNITED STATES.
Keiko ASAI et al., Petitioners,
v.
IMMIGRATION & NATURALIZATION SERVICE, Respondent.
 Nos. 76-1909 and 77-1400.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Dec. 12, 1977.
Decided March 1, 1978.
 
 Appeal from the United States District Court for the District of Columbia (D.C. Civil 74-1340).
 David Carliner, Washington, D. C., for appellant and petitioners.
 Richard I. Chaifetz, Atty., Dept. of Justice, Washington, D. C., for appellee and respondent.
 Before BAZELON, Chief Judge, and LEVENTHAL and ROBINSON, Circuit Judges.
 Opinion for the Court filed by BAZELON, Chief Judge.
 BAZELON, Chief Judge:
 
 
 1
 The Unification Church, also known as the Holy Spirit Association for the Unification of World Christianity, is an interfaith religious movement with membership in approximately 40 countries. The Church has established facilities at Tarrytown and Barrytown, New York, to train missionaries needed to staff its worldwide evangelical program. These two cases concern the efforts of the Church to bring aliens to the United States for missionary training at these facilities. In No. 76-1909 the Church appeals the Immigration and Naturalization Service's denial of the Church's petitions to have these aliens admitted as "trainees" under 8 U.S.C. § 1101(a)(15)(H) (iii).[1] See 8 U.S.C. § 1184(c). In No. 77-1400, the Church urges us to vacate deportation orders lodged against these aliens and to stay further deportation hearings until the validity of its H-3 petitions[2] is conclusively determined.
 
 
 2
 * A district director of the Immigration and Naturalization Service (INS) initially denied the Church's H-3 petitions. Joint Appendix (J.A.) at 76, 125-30.[3] His decision was affirmed by the Northeast regional commissioner. J.A. at 77. The commissioner stated that:
 
 
 3
 The record further reveals that many of the beneficiaries as well as other aliens not currently covered by an approved or pending H-3 petition were located in various towns and cities throughout the United States engaged in the sale of such merchandise as tea, flowers, candles, peanuts and candy in shopping centers, on the streets, and on a door-to-door basis, and soliciting donations on behalf of the Unification Church. In a number of instances, arrests by police authorities resulted because the solicitation of funds was in violation of local ordinances. Some of these aliens had been in this country less than a few weeks' time, one such individual having been admitted about one week earlier. Many of the aliens encountered by Service officers were found to be in the United States unlawfully by reason of having remained here beyond their authorized period of stay.
 
 J.A. at 80. The commissioner concluded:
 
 4
 Despite the assertion that such solicitations were only a small part of the overall field experience, information received from various Service officers, throughout the United States substantiates that the beneficiaries have been widely and repeatedly engaged in such pursuit. We are led to the inescapable conclusion that the petitioner's current training program, which calls for three times as much field work as formal study, has been designed primarily for fund raising rather than for training purposes.
 
 
 5
 J.A. at 88.
 
 
 6
 The Church sought review in district court under the Administrative Procedure Act, arguing that these passages revealed that the commissioner had violated INS regulations prohibiting decisionmaking on the basis of adverse information not made available to the affected party.[4] See 8 C.F.R. §§ 103.2(b)(2), 214.2(h)(6) (1977). The district court agreed and remanded the case "to the Regional Commissioner" ordering that it be "reopened to provide the plaintiff the opportunity to inspect and rebut the adverse information." J.A. at 32; Civil Action No. 74-1340 (D.D.C. 4 March 1975).
 
 
 7
 On remand the regional commissioner made available to the Church all adverse information in his files; the Church submitted a memorandum in response to this information. The commissioner reaffirmed his earlier decision, and his ruling was in turn affirmed by the district court. Civil Action No. 74-1340 (D.D.C. 27 July 1976). The Church appeals.[5]
 
 
 8
 The Church argues, first, that it was error for the district court not to have remanded the case to the district director. The Church contends that this mistake was harmful because the regional commissioner's determinations are not de novo and because he will set aside the decisions of a district director only if they are arbitrary and capricious.
 
 
 9
 We find it unnecessary to decide whether the case should have been remanded to the district director. We note that the Church had initially challenged an action of the regional commissioner. When the district court ordered the case remanded to the commissioner, he might have felt obligated by the order to himself proceed in the matter. We need not pursue the problem, however, because if suffices to conclude that we see no prejudice to the Church from the procedure that was followed.
 
 
 10
 The Administrative Procedure Act requires us to take "due account . . . of the rule of prejudicial error." 5 U.S.C. § 706. While the doctrine under which appellate courts ignore harmless error may not insulate officials or agencies to the same extent that it will trial judges, still it has material application. Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C. 399, 411-412, 379 F.2d 453, 465-66 (1967). We cannot hold on this record that appellant has been prejudiced by the remand to the regional commissioner. The commissioner invited appellant to introduce new evidence, J.A. at 154, and appellant neither proffered nor introduced any. Moreover, we do not find that the commissioner's decision was as constricted in scope as represented by appellant. The commissioner stated that:
 
 
 11
 The Petitioner has not met the burden imposed upon him by regulation Matter of Brantigan, 11 I. & N. Dec. 493 nor has he shown that the (challenged) decision is without a rational basis or that it is arbitrary, capricious, or an abuse of discretion. Accordingly, the denial of the petitions will be affirmed and the appeals will be dismissed.
 
 
 12
 J.A. at 182. Even assuming that "the (challenged) decision" referred to is that of the district director rather than the regional commissioner's own prior decision, the commissioner independently concluded that appellant had not met "the burden imposed upon him by regulation." This conclusion is not beyond the commissioner's authority under INS regulations. See 8 C.F.R. §§ 103.1(m) (11), 103.3 (1977).[6]
 
 
 13
 The Church also argues on appeal that the regional commissioner abused his discretion in denying its H-3 petitions. It contends that the INS has authority only to decide if a proposed training program is bona fide, and that it has "no authority to pass on the administration, development, need, effectiveness, and utility of a bona fide training program."[7] Brief for appellant at 19. We need not reach the question of whether the INS can rely on any of these criteria.[8] However, since in our view the commissioner justifiably determined that the Church's training program was not bona fide. Essentially, the commissioner found that the Church was not training the intended beneficiaries of its H-3 petitions at all, but instead was using them to solicit funds to support the Church. J.A. at 88, 180. We cannot say that this finding constitutes an abuse of discretion.
 
 
 14
 We also conclude that the denial of its H-3 petitions did not deprive the Church of any First Amendment rights. While we agree with appellant that the attorney general is not vested by statute with the responsibility of imposing standards for the conduct of a religious training program, brief for appellant at 14, we find that the actions of the INS in this case did not amount to such an intrusion. As required by statute, the commissioner merely made the legitimate threshold determination that the Church's training program was not bona fide. Kleindienst v. Mandel, 408 U.S. 753, 769-70, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972).
 
 II
 
 15
 The approximately 585 beneficiaries of the Church's H-3 petitions were variously admitted to the United States as visitors for business or as visitors for pleasure. See 8 U.S.C. § 1101(a)(15)(B). The parties have stipulated that this court treat Keiko Asai as representative of these beneficiaries.[9]
 
 
 16
 When the Northeast regional commissioner denied the Church's H-3 petitions, Asai applied for an extension of her stay in the United States. On September 5, 1974, the district director denied her application, stating as his reason that she "failed to establish that the purpose for which (she was) admitted has not been accomplished and that (her) requested extension is not merely an attempt to prolong (her) stay indefinitely." Appendix (App.) at 17. Asai was instructed "to depart from the United States not later than September 20, 1974." Id. No hearing was held before the district director.
 
 
 17
 When Asai failed to depart the United States by September 20, an Order was served upon her to show cause why she should not be deported. At her deportation hearing, the Immigration Judge ruled that her deportability had "been established by clear, convincing, and unequivocal evidence." Id. at 13. Relying on Matter of Sourbis, 11 I & N Dec. 335 (1965), he ruled that it was not necessary for him to determine whether the purpose for which she was admitted to the United States had been accomplished or whether she was merely attempting to prolong her stay indefinitely, because he did "not have jurisdiction to make any determination as to the propriety of the District Director's decision." App. at 9. The Judge also ruled that the INS was under no obligation to stay deportation proceedings pending a final judicial resolution of the Church's H-3 petitions. On appeal, the Judge's decision was sustained by the Board of Immigration Appeals.[10] In No. 77-1400, Asai petitions this court for review.[11]
 
 
 18
 Asai argues, first, that this court should invalidate the deportation order issued against her and stay all further deportation hearings pending a final judicial determination of the Church's H-3 petitions. Asai claims that the deportation proceedings render her ineligible under 8 U.S.C. § 1258 to change her nonimmigrant status to that of a trainee should a court ultimately decide that the Church's H-3 petitions be granted.[12] She requests relief under the Administrative Procedure Act, 5 U.S.C. § 705, which she urges authorizes this court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."[13]
 
 
 19
 Putting aside the fact that we have today upheld the INS's denial of the Church's H-3 petitions, we find petitioner's argument to be without merit. Section 1258 of Title 8 of the United States Code states:
 
 
 20
 The Attorney General may, under such conditions as he may prescribe, authorize a change from any nonimmigrant classification to any other nonimmigrant classification in the case of any alien lawfully admitted to the United States as a nonimmigrant who is Continuing to maintain that status, . . . .
 
 
 21
 (Emphasis added.)
 
 
 22
 It is not clear from the statute whether an applicant nonimmigrant must continue to maintain his "status" only until he petitions for a change in classification,[14] or whether he must continue to maintain it until his petition is granted. In either case, however, the vacating of the deportation order would not assist Asai in the assertion of her rights under the statute. There is no question that Asai was maintaining her status within the meaning of INS regulations when she initially filed to change to an H-3 nonimmigrant classifications.[15] Her later deportation cannot change that fact.[16] On the other hand, if the statute is interpreted as requiring the applicant alien to continue to maintain his status until a change in classification is granted, the deportation proceedings are equally irrelevant. Asai ceased to maintain her status on September 20, 1974, when she failed to depart the United States as instructed by the district director. App. at 19. We conclude, therefore, that vacating the deportation orders issued against the beneficiaries of the Church's H-3 petitions will not serve to protect their rights under 8 U.S.C. § 1258 pending final judicial review of their case.
 
 
 23
 Asai's second argument in this petition is that her deportation hearing lacked due process of law because the Immigration Judge refused to consider de novo the district director's denial of her application for an extension of her stay. The director had determined that Asai had "failed to establish that the purpose for which (she was) admitted has not been accomplished and that (her) requested extension is not merely an attempt to prolong (her) stay." Asai's position is that the director's conclusion rests upon findings of fact, yet she was provided neither with notice of these proposed findings nor with a hearing in which to refute them.
 
 
 24
 The INS contends that we have no jurisdiction under 8 U.S.C. § 1105a(a) to review decisions of a district director that are collateral to a deportation proceeding.[17] Such decisions, the INS urges, are reviewable in district court. See Cheng Fan Kwok v. INS, 392 U.S. 206, 210, 88 S.Ct. 1970, 20 L.Ed.2d 1037 (1968); Butterfield v. INS, 133 U.S.App.D.C. 135, 409 F.2d 170 (1969).
 
 
 25
 Petitioner responds that she is not asking this court to review the decisions of the district director, but to pass on the validity of INS's interpretation of its own regulations making these decisions, reached without the opportunity for a hearing, binding on an Immigration Judge during a deportation proceeding. See Matter of Sourbis, 11 I & N Dec. 335 (1965); 8 C.F.R. §§ 103.1(f), 214.1(a), 242.16 (1977).
 
 
 26
 We agree that we have jurisdiction to consider this question, embracing as it does a final determination "made during a proceeding conducted under § 242(b) ( 8 U.S.C. § 1252(b))." Cheng Fan Kwok v. INS, 392 U.S. 206, 216, 88 S.Ct. 1970, 1976, 20 L.Ed.2d 1037 (1968). Nevertheless, we find that petitioner's deportation hearing did not lack due process.
 
 
 27
 There is no specific statute that grants the attorney general the authority to extend the stay of a nonimmigrant in the United States. Section 1184(a) of Title 8 of the United States Code, however, authorizes the attorney general to admit nonimmigrants "for such time" as he "may by regulations prescribe." The attorney general has authorized district directors to decide whether extensions should be granted; these decisions are made without a hearing and without appeal. See 8 C.F.R. § 241.1(a) (1977). The granting of an extension is thus a political decision committed to executive discretion, and is conceptually analogous to the original granting of a visa. See 8 U.S.C. § 1201(a) (1970). Due process of law requires no hearing if an application for a visa is denied. See United States ex rel. Ulrich v. Kellogg, 58 U.S.App.D.C. 360, 362, 30 F.2d 984, 986, Cert. denied sub nom., United States ex rel. Ulrich v. Stimson, 279 U.S. 868, 49 S.Ct. 482, 73 L.Ed. 1005 (1929). While we are aware that petitioner was a lawfully admitted alien at the time of her application for an extension of the period of her temporary stay, we hold that the requirements of due process were met in these circumstances by the availability of judicial review under the Administrative Procedure Act to determine if the district director's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Cf. Foti v. INS, 375 U.S. 217, 228 & n.15, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963).
 
 
 28
 Since the district director's denial of petitioner's application did not violate due process, neither did the Immigration Judge's reliance on it at her deportation proceeding. The attorney general is authorized by statute to delegate the duties and powers conferred upon him by the Immigration and Nationality Act, 8 U.S.C. § 1103, and we will not disturb the regulations he has established delegating these powers unless they violate the Act or the Constitution.[18]
 
 
 29
 We therefore affirm the decision of the Board of Immigration Appeals in No. 77-1400, and we affirm the decision of the district court in No. 76-1909.
 
 
 30
 So ordered.
 
 
 
 [1]
 8 U.S.C. § 1101(a)(15)(H)(iii) reads, in the pertinent part, that:
 The term "immigrant" means every alien except an alien who is within one of the following classes of nonimmigrant aliens
 (H) an alien having a residence in a foreign country which he has no intention of abandoning . . . (iii) who is coming temporarily to the United States as a trainee. . . .
 Before an alien can achieve "H-3" status, an employer must file an acceptable petition with the attorney general. 8 U.S.C. § 1184(c) states:
 The question of importing any alien as a nonimmigrant under section 1101(a) (15)(H) or (L) of this title in any specific case or specific cases shall be determined by the Attorney General, after consultation with appropriate agencies of the Government, upon petition of the importing employer. Such petition shall be made and approved before the visa is granted. The petition shall be in such form and contain such information as the Attorney General shall prescribe. The approval of such a petition shall not, of itself, be construed as establishing that the alien is a nonimmigrant.
 These petitions are termed "H-3" petitions.
 
 
 [2]
 See note 1 Supra
 
 
 [3]
 The district director concluded that the Church had
 failed to specifically or adequately describe the training program of its organization. The first phase of the proposed training, consisting of approximately 16 months of classroom training, practice teaching and public speaking, is more appropriate to a scholastic program rather than to a training program as contemplated under section 101(a)(15)(H)(iii) of the Immigration and Nationality Act. Consequently, approval of this petition would, in effect, permit the petitioner to circumvent the regulations governing the admission of nonimmigrant students. The second phase of the proposed training during which the beneficiary would acquire experience in the field consists, in part, of fund raising by solicitation on the street. This aspect of the program is a condition of employment not usually found in bona fide trainee situations. Moreover, the petitioner has not established that trainees engaged in soliciting funds would receive sufficient supervision to prevent possible abuses inherent in such a situation.
 J.A. at 76.
 
 
 [4]
 8 C.F.R. § 103.2(b)(2) (1977) states that no application presented to the Service can be denied on the basis of derogatory evidence unless the applicant is "advised thereof and offered an opportunity to rebut it and present evidence in his behalf before the decision is rendered." In the adjudication of petitions for alien trainees, 8 C.F.R. § 214.2(h)(6) (1977) provides that: "If an adverse decision is proposed on the basis of any evidence not submitted by the petitioner, he shall be so notified before a final decision is made and invited to inspect and rebut such evidence."
 
 
 [5]
 The government argues that this case is moot:
 In this case an application for approval of a trainee program was filed on February 11, 1974. The petition represented that the training program would have a duration of 26 months. It was also represented that the approximately 585 alien beneficiaries had already entered this country in a variety of different nonimmigrant classifications and that they had all commenced the training course. Since 26 months from the date of application passed in April or May of 1976, it is reasonable to assume that all of the proposed beneficiaries have completed their training program and should by now have departed the United States.
 Brief for appellees at 26-27.
 We cannot agree with this argument for the simple reason that there is no evidence in the record whether any beneficiaries of the Church's H-3 petition have in fact begun, much less completed, the proposed training program.
 
 
 [6]
 Appellant also contends that the regional commissioner violated 8 C.F.R. 214.2(h)(6) which requires that the "pertinent facts" that are relied upon be "set forth" with the "specific reasons for the decision in the light of the facts. . . ." Although the commissioner concededly permitted the Church access to the entire administrative file, appellant claims that it "was left to speculate which of the mass of undifferentiated statements and reports in the file were 'pertinent facts' for the purpose of rendering an adverse decision." Brief for appellant at 14
 We find, however, that the commissioner has fulfilled his obligations under the regulations when, as in this case, he has made available to the appellant the entire file, and can reasonably claim to have based his decision that the Church's missionary program was in actuality a means of fund solicitation rather than a bona fide training program on "the overall import of the evidence considered." J.A. at 178.
 
 
 [7]
 See note 1 Supra for the statutory framework governing H-3 petitions
 
 
 [8]
 The INS takes the position that in considering an H-3 petition,
 the Service must determine both whether the training program in question is a bona fide program and whether a necessity exists for that particular training program. This is necessary because Congress intended in enacting 8 U.S.C. 1101(a)(15)(H)(iii) to provide training which would be useful to the economic development of the various foreign nations involved. S.Rep. 1515, 81st Cong., 2d Sess., 567-573 (1950). If the program in question does not prepare the trainee to perform useful services in his native land, it is highly questionable whether the program is one which Congress envisioned when it enacted this provision.
 Brief for appellee at 12-13. INS regulations require an H-3 petition to set out "the reasons why such training cannot be obtained in the alien's country, and why it is necessary for the alien to be trained in the United States." 8 C.F.R. § 214.2(h)(4)(iii). In this case the regional commissioner had concluded that since "the practice of public fund solicitation is frowned upon by people of most other countries," the Church had not demonstrated "that any fund raising techniques or related knowledge acquired in the United States will be utilized by these aliens when they return to their respective native lands." J.A. at 148.
 Suffice it to say that Senate Report No. 1515 does not appear to stand for the proposition for which it is cited by the INS. In fact the Report states that "(t)he promotion of trainee programs has been adopted as part of the United States foreign policy as a means of spreading a better understanding of our country among the peoples of the world, and assisting in the rehabilitation of war-devastated countries." Id. at 571-72. In any event the Report is not a particularly reliable source of insight into congressional intent, since it was composed in response to a Senate resolution to investigate the immigration system and did not accompany any actual legislation. Moreover, the Report actually recommended that a special classification for trainee nonimmigrants Not be created, Id. at 573, a recommendation set aside two years later by the 82d Congress when it enacted § 101(a)(15)(H)(iii) of the Immigration and Nationality Act of 1952, 66 Stat. 168.
 
 
 [9]
 The parties have agreed that "the administrative record relating to Matter of Asai contains all of the relevant materials required for this court to determine the issues; (and) that the administrative records relating to the remaining named petitioners are not required for the presentation of the factual and legal questions to this court in considering the present appeal." Brief for petitioner at 2 n.4
 
 
 [10]
 Asai failed to depart voluntarily, and a warrant of deportation was issued on April 18, 1977
 
 
 [11]
 The INS argues that this petition should be dismissed for lack of venue. We do not agree
 Section 106(a)(2) of the Immigration and Nationality Act, as amended, Sept. 26, 1961, Pub.L. 87-301, 75 Stat. 651, 8 U.S.C. § 1105a(a)(2), provides:
 the venue of any petition for review under this section shall be in the judicial circuit in which the administrative proceedings before a special inquiry officer were conducted in whole or in part, or in the judicial circuit wherein is the residence, as defined in this Act, of the petitioner, but not in more than one circuit.
 Section 101(a)(33) of the Act, 8 U.S.C. § 1101(a)(33), defines residence as follows:
 The term "residence" means the place of general abode; the place of general abode of a person means his principal, actual dwelling place in fact, without regard to intent.
 This definition represents a codification of the Supreme Court's holding in Savorgnan v. United States, 338 U.S. 491, 70 S.Ct. 292, 94 L.Ed. 287 (1950), See H.R.Rep. No. 1365, 82d Cong., 2d Sess. 33 (1952), in which the Court noted that, as distinguished from domicile or permanent residence, intent is not material to establish actual residence, principal dwelling place, or place of abode.
 In this case, the petitioners' affidavits indicate that their "official residence" for the purpose of all communications in the United States was originally established in Washington, D.C. Although having thereafter lived "temporarily" in New York, petitioners state that they have now resumed their residency in Washington. No effort is made to conceal the motive behind their return to the District, it being to secure venue before this court for the appeal of their deportations.
 Respondent alleges that despite these statements, the petitioners do not, in fact, reside in Washington, D.C. Respondent's affidavits on this issue, however, are less than dispositive. In fact, all they conclusively indicate is that petitioners have only spent a brief time physically present in Washington. Currently, they note, petitioners are outside Washington, engaging in "missionary" work in various parts of the country. From this respondent concludes that petitioners have not been present in Washington long enough to establish residency and, therefore, must be considered residents of New York.
 The fact that petitioners have spent only a short time physically present in the District, however, does not foreclose their having established residency here. Residency does not require continuous physical presence; in fact,
 "Principal" admits of multiple stopping-places, just as "general abode" admits of other specific habitation not so qualified. . . . Thus, it is a question of fact in each instance as to Which is the "principal dwelling place".
 Toy Teung Kwong v. Acheson, 97 F.Supp. 745, 747 (N.D.Cal.1951). Consequently, there being no direct evidence contrary to petitioners' claims that they have abandoned their New York residency, the remaining facts, on balance, favor a finding that petitioners have now established residency in Washington. Since, as the INS acknowledges, a major purpose of section 1105a(a)(2) was to speed up the review of deportation orders, and since the parties in this case have agreed that all other similarly situated potential litigants will be bound by the decision of this court on the merits, See note 9 Supra, thus resulting in the expeditious disposition of approximately 175 pending matters before the INS, we hold that venue exists.
 
 
 [12]
 Following the order of the district court that the Church's H-3 petitions be reconsidered by the regional commissioner, the INS deferred action to enforce the departure of the petitions' beneficiaries until entry of the district court's final decision. The question, therefore, is whether the deportation proceedings should be stayed pending this court's decision and any further judicial appeals
 
 
 [13]
 Petitioner argues that the APA Requires the INS itself to preserve her status and rights pending the conclusion of judicial review. Brief for petitioner at 27. We need only point out, however, that § 705 states only that, even if justice requires such a stay, an agency "May postpone the effective date of action taken by it, pending judicial review." (Emphasis added.)
 Although there is considerable discussion in petitioner's brief about various representations made by INS officials, petitioner does not rely on an estoppel theory, as indeed she cannot, having not demonstrated any detrimental reliance on these representations.
 
 
 [14]
 This appears to be the position taken by the INS in its regulations. See 8 C.F.R. § 248.1(a), (b), (1977), note 15 Infra
 
 
 [15]
 The pertinent INS regulations are to be found at 8 C.F.R. § 248.1(a), (b) (1977):
 § 248.1 Eligibility.
 (a) General. . . . (A)ny alien lawfully admitted to the United States as a nonimmigrant, . . . who is continuing to maintain his nonimmigrant status, may apply to have his nonimmigrant classification changed to any nonimmigrant classification other than that of a fiancee or fiance under section 101(a)(15) (K) of the Act.
 (b) Maintenance of status. In determining whether an applicant has continued to maintain his nonimmigrant status, the district director shall consider whether the alien has remained in the United States for a longer period than that authorized by the Service, and shall consider any conduct by the applicant relating to his maintenance of the status from which the applicant is seeking a change. An applicant may not be considered as having maintained his nonimmigrant status within the meaning of this section if he failed to submit his application for change of nonimmigrant classification before his authorized temporary stay in the United States had expired, unless the district director in his discretion is satisfied that the failure to file a timely application was excusable, that the alien has not otherwise violated his nonimmigrant status and is a bona fide nonimmigrant, and the alien is not the subject of deportation proceedings under Part 242 of this chapter.
 
 
 [16]
 Thus the Board of Immigration Appeals stated specifically that "(t)he remedies being sought by the respondents are not relevant to the question of their deportability. Their presence in the United States is not required for the pursuit of the petitions for H-3 classification." App. at 5
 Given this observation of the Board of Immigration Appeals, we feel confident in interpreting the reference in § 248.1(b) to deportation proceedings as indicating merely an additional factor that a district director may consider if an alien has failed to submit an application for a change in nonimmigrant classification "before his authorized temporary stay in the United States had expired." Asai, of course, applied Before her temporary stay had expired.
 
 
 [17]
 8 U.S.C. § 1105a(a) provides that the procedures prescribed by the Administrative Orders Review Act, 28 U.S.C. § 2341, Et seq
 shall apply to, and shall be the sole and exclusive procedure for, the judicial review of all final orders of deportation heretofore or hereafter made against aliens within the United States pursuant to administrative proceedings under section 242(b) of this Act (8 U.S.C. § 1252(b)) . . . .
 
 
 [18]
 The cases petitioner presses upon us are unavailing to establish her position. Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945), concerned a statutory interpretation of conflicting sections of the Federal Communications Act, Id. at 329-30, 66 S.Ct. 148, whereas we do not find any contradiction between 8 U.S.C. § 1184(a), authorizing the Attorney General to admit nonimmigrants for such time as he may by regulations prescribe, and 8 U.S.C. § 1252(b), requiring that special inquiry officers conduct proceedings to determine the deportability of aliens. Similarly Mahler v. Eby, 264 U.S. 32, 44 S.Ct. 283, 68 L.Ed. 549 (1924), rested squarely on questions of statutory interpretation; the case determined what factual findings were necessary to support an order of deportation under the Act of May 10, 1920, c. 174, 41 Stat. 593