Gholamreza NARENJI, Behzad
Vahedi, Cyrus Vahidnia

v.

Benjamin CIVILETTI, Attorney General,
et al., Appellants.

CONFEDERATION OF IRANIAN
STUDENTS

v.

Benjamin R. CIVILETTI, Appellant.

Nos. 79–2460, 79–2461.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 20, 1979.

Decided Dec. 27, 1979.

As Amended Jan. 2, 1980.

Rehearing En Banc Denied Jan. 31, 1980.

Robert E. Kopp, Atty., Dept. of Justice, Washington, D. C., with whom Carl S. Rauh,* U. S. Atty., Ronald R. Glancz, Anthony J. Steinmeyer, Michael Jay Singer, Elizabeth Gere Whitaker, Brook Hedge, John F. Cordes, Attys., Dept. of Justice, Washington, D. C., were on the brief, for appellants.

Eric M. Lieberman, New York City, with whom Alan Dranitzke, Washington, D. C., was on the brief, for appellees, Narenji et al.

Charles Gordon, Washington, D. C., for appellee, Confederation of Iranian Students.

Dale F. Swartz, Washington, D. C., was on the brief for amicus curiae, Lawyers Committee for International Human Rights, urging affirmance.

Jordan J. Paust, Houston, Tex., was on the brief for amicus curiae, Human Rights Advocates (U.S.A.), urging affirmance.

Before TAMM, MacKINNON and ROBB, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROBB.

Concurring opinion filed by Circuit Judge MacKINNON.

ROBB, Circuit Judge:

This is an appeal from a judgment of the District Court declaring unconstitutional a regulation promulgated by the Attorney General at the direction of the President. In the circumstances of this case the court has concluded that the challenged regulation, 8 C.F.R. § 214.5, issued November 13, 1979, must be sustained.

Regulation 214.5 requires all nonimmigrant alien post-secondary school students who are natives or citizens of Iran to report to a local INS office or campus representative to "provide information as to residence and maintenance of nonimmigrant status." At the time of reporting each student must present his passport and evidence of his school enrollment, of payment of fees, of the number of course hours in which he is enrolled, of his good standing, and his current address in the United States. The

---

* Carl S. Rauh was United States Attorney at the time briefs were filed.

regulation provides that failure to comply with the reporting requirement will be considered a violation of the conditions of the nonimmigrant's stay in the United States and will subject him to deportation proceedings under section 241(a)(9) of the Act.

■ The regulation is within the authority delegated by Congress to the Attorney General under the Immigration and Nationality Act. That statute charges the Attorney General with "the administration and enforcement" of the Act, 8 U.S.C. § 1103(a), and directs him to "establish such regulations . . . and perform such other acts as he deems necessary for carrying out his authority under the provisions of" the Act. *Id.* He is directed to prescribe by regulation the time for which any nonimmigrant alien is admitted to the United States, and the conditions of such an admission. 8 U.S.C. § 1184(a). Finally, the Act authorizes the Attorney General to order the deportation of any nonimmigrant alien who fails to maintain his nonimmigrant status or to comply with the conditions of such status. 8 U.S.C. § 1251(a)(9). These statutory provisions plainly encompass authority to promulgate regulation 214.5.

■ Recognizing the broad authority conferred upon the Attorney General by the Immigration and Nationality Act the District Court nevertheless thought that the Act does not empower him to draw distinctions among nonimmigrant alien students on the basis of nationality. We do not accept this conclusion. The statute need not specifically authorize each and every action taken by the Attorney General, so long as his action is reasonably related to the duties imposed upon him. *See Ahmed v. United States,* 480 F.2d 531 (2d Cir. 1973); *Pilapil v. INS,* 424 F.2d 6, 11 (10th Cir.), *cert. denied,* 400 U.S. 908, 91 S.Ct. 752, 27 L.Ed.2d 147 (1970); *Unification Church v. Attorney General,* 189 U.S.App.D.C. 92, 99–100, 581 F.2d 870, 877–78, *cert. denied,* 439 U.S. 828, 99 S.Ct. 102, 58 L.Ed.2d 122 (1978); *Mak v. INS,* 435 F.2d 728, 730 (2d Cir. 1970). Furthermore, we note that the Act, 8 U.S.C. § 1303(a), does specifically authorize the Attorney General "to pre-

scribe special regulations and forms for the registration and fingerprinting of . . . (5) aliens of any other class not lawfully admitted to the United States for permanent residence." Finally, failure to maintain nonimmigrant status or to comply with the conditions of such status is specified as a ground for deportation. 8 U.S.C. § 1251(a)(9). We conclude that promulgation of regulation 214.5 is directly and reasonably related to the Attorney General's duties and authority under the Act.

■ The District Court concluded that even if authorized by statute regulation 214.5 is unconstitutional because it violates the Iranian students' right to equal protection of the laws. The court found no basis for the "discriminatory classification" of the students established by the regulation. Here again we must differ. Distinctions on the basis of nationality may be drawn in the immigration field by the Congress or the Executive. *See Saxbe v. Bustos,* 419 U.S. 65, 95 S.Ct. 272, 42 L.Ed.2d 231 (1974); *Mathews v. Diaz,* 426 U.S. 67, 81–82, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1970); *Fiallo v. Bell,* 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977); L. Henkin, *Foreign Affairs and the Constitution,* 258 (1972); Maltz, *Alienage Classifications,* 31 Okla.L.Rev. 671, 684–91 (1978). So long as such distinctions are not wholly irrational they must be sustained.

■ By way of an affidavit from the Attorney General we are informed that his regulation was issued "as an element of the language of diplomacy by which international courtesies are granted or withdrawn in response to actions by foreign countries. The action implemented by these regulations is therefore a fundamental element of the President's efforts to resolve the Iranian crisis and to maintain the safety of the American hostages in Tehran." The Attorney General refers of course to the lawless seizure of the United States Embassy in Tehran and the imprisonment of the embassy personnel as hostages. Those actions denied to our embassy and citizens the protection to which they are entitled under the Amity Treaty in force between the United

States and Iran (284 United Nations Treaty Series 93), and under international law. The lawlessness of this conduct of the Iranian government was recognized by the decision of the World Court on December 15, 1979. *United States v. Iran*, General List No. 64 (Int'l Ct. Justice, Dec. 15, 1979). Thus the present controversy involving Iranian students in the United States lies in the field of our country's foreign affairs and implicates matters over which the President has direct constitutional authority. *Mathews v. Diaz, supra.*

The District Court perceived no "overriding national interest" justifying the Attorney General's regulation: it found that "although defendants' regulation is an understandable effort designed to somehow reply to the Iranian attack upon this nation's sovereignty and the seizure of its citizens, it is one that does not support a legitimate national interest". In this we think the District Court erred.

As we have said, classifications among aliens based upon nationality are consistent with due process and equal protection if supported by a rational basis. *Mathews v. Diaz, supra* ; *Fiallo v. Bell, supra.* The Attorney General's regulation 214.5 meets that test; it has a rational basis. To reach a contrary conclusion the District Court undertook to evaluate the policy reasons upon which the regulation is based. In doing this the court went beyond an acceptable judicial role. Certainly in a case such as the one presented here it is not the business of courts to pass judgment on the decisions of the President in the field of foreign policy. Judges are not expert in that field and they lack the information necessary for the formation of an opinion. The President on the other hand has the opportunity of knowing the conditions which prevail in foreign countries, he has his confidential sources of information and his agents in the form of diplomatic, consular and other officials. *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320, 57 S.Ct. 216, 81 L.Ed. 255 (1936). As the Supreme Court said in *Mathews v. Diaz, supra*, 426 U.S. at 81, 82, 96 S.Ct. at 1892:

> For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government. Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary. This very case illustrates the need for flexibility in policy choices rather than the rigidity often characteristic of constitutional adjudication. . . . Any rule of constitutional law that would inhibit the flexibility of the political branches of government to respond to changing world conditions should be adopted only with the greatest caution. The reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization. [Footnotes omitted]

And in *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1952), Mr. Justice Jackson wrote for the Court:

> It is pertinent to observe that any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference. [Footnote omitted]

This court is not in a position to say what effect the required reporting by several thousand Iranian students, who may be in this country illegally, will have on the attitude and conduct of the Iranian government. That is a judgment to be made by the President and it is not for us to overrule him, in the absence of acts that are clearly in excess of his authority.

In view of the foregoing the judgment of the District Court is reversed with directions to dismiss the complaints and enter judgment for the defendants.

*So ordered.*

MacKINNON, Circuit Judge (concurring):

I concur completely in the court's opinion but write separately to add additional support for its ruling.

First, to indicate that this is not an isolated act of diplomacy in the international crisis that faces the United States I would stress that the record also reflects that, as part of the same diplomatic effort, the President by order prohibited "crude oil produced in Iran [from entering] the . . . United States" (Defendant's Ex. 3) and blocked all property and interests of the Government of Iran subject to United States jurisdiction (Defendant's Ex. 4). I also take judicial notice of the reports that substantial forces of the United States Navy have been moved to the Indian Ocean and the President has ordered the Iranian Embassy and consulate to return approximately 85% of its diplomatic staff to Iran.

It is also significant that Regulation 214.5 seeks "to identify Iranian students in the United States who are not maintaining status and to take immediate steps to commence deportation proceedings against such persons" (44 F.Reg. 65727) "*in accordance with constitutional due process requirements.*" (Defendant's Ex. 3).

The disparity in treatment afforded the appellee nonimmigrant alien students who are in violation of our immigration laws is based upon the fact that the Government of their home country has committed, and is committing, a number of violent lawless acts against the United States and its citizens. That unlawful conduct against the United States places appellees, and others similarly situated who owe their allegiance to that country, in a different class for immigration purposes from the nonimmigrants of any other country. Therefore, since their government has made appellees part of a distinctly separate class, the United States under our Constitution may treat them differently because of the reasons that separate them from other aliens in the United States. The different treatment they may receive under subject regulation is directly related to the reasons for their different classification.

The status of Iranian aliens cannot be disassociated from their connection with their mother country since the alien "leaves outstanding a foreign call on his loyalties which international law not only permits our Government to recognize but commands it to respect." *Harisiades v. Shaughnessy,* 342 U.S. 580, 585–586, 72 S.Ct. 512, 517, 96 L.Ed. 586 (1951). The connection with the home country also means that the power of the United States Government to terminate the alien's stay is a necessary corollary to that observation:

Under our law, the alien in several respects stands on an equal footing with citizens, but in others has never been conceded legal parity with the citizen. Most importantly, to protract this ambiguous status within the country is not his right but is a matter of permission and tolerance. The Government's power to terminate its hospitality has been asserted and sustained by this Court since the question first arose.

War, of course, is the most usual occasion for extensive resort to the power. Though the resident alien may be personally loyal to the United States, if his nation becomes our enemy his allegiance prevails over his personal preference and makes him also our enemy, liable to expulsion or internment, and his property becomes subject to seizure and perhaps confiscation. But it does not require war to bring the power of deportation into existence or to authorize its exercise. Congressional apprehension of foreign or internal dangers short of war may lead to its use. So long as the alien elects to continue the ambiguity of his allegiance his domicile here is held by a precarious tenure.

That aliens remain vulnerable to expulsion after long residence is a practice that

bristles with severities. But it is a weapon of defense and reprisal confirmed by international law as a power inherent in every sovereign state. Such is the traditional power of the Nation over the alien and we leave the law on the subject as we find it.

342 U.S. at 586–88, 72 S.Ct. at 517–518. (Footnotes omitted)

It is thus my conclusion that the actions of the President and the Attorney General here questioned do "bear [a] reasonable relation to protection of the legitimate interests of the United States," *Harisiades v. Shaughnessy*, 342 U.S. 580, 584, 72 S.Ct. 512, 516, 96 L.Ed. 586 (1951) and conform to due process requirements. *Id.* 588–591, 72 S.Ct. 512.

On Suggestions for Rehearing En Banc (D.C.Civil Nos. 79–3189 & 79–3210).

Opinion filed by Circuit Judge MacKINNON setting forth his reasons for voting against rehearing.

Joint statement of Chief Judge J. SKELLY WRIGHT and of Circuit Judges SPOTTSWOOD W. ROBINSON, III, WALD and MIKVA setting forth their reasons for voting to rehear these cases en banc.

Before WRIGHT, Chief Judge, and McGOWAN, TAMM, ROBINSON, MacKINNON, ROBB, WILKEY, WALD, and MIKVA, Circuit Judges.

## ORDER

PER CURIAM.

The suggestions for rehearing *en banc* filed by appellees (Narenji, et al., and Confederation of Iranian Students) and the brief in support thereof filed by amicus curiae (Assoc. of Arab American University Graduates) having been transmitted to the full Court and a majority of judges not having voted in favor thereof, it is

ORDERED, by the Court, *en banc*, that appellees' aforesaid suggestions for rehearing *en banc* are denied.

MacKINNON, Circuit Judge:

The following individual opinion responds to the petition for rehearing and the *amicus* brief.

The principal point raised by Appellees' petition for rehearing *en banc* points out that the court's opinion does not discuss the Supreme Court's decision in *Kent v. Dulles*, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958) which Appellees' assert is the "leading case" on the issues here involved. In claimed reliance thereon Petitioners contend that the "statute vests no greater discretionary authority in the Attorney General" than the passport statute which was involved in *Kent.* That argument involves such a gross distortion of the facts and the holding in both *Kent* and this case, that it should be answered.

*Kent* arose under the passport statute and involved *American citizens* who were not in violation of the laws of this country but who were denied passports because they refused to sign non-communist affidavits. Whereas this case primarily involves non-immigrant *aliens* who *are in violation* of our immigration laws.[1] To say that the Constitution and Immigration Laws vest the President and the Attorney General with no greater rights over *illegal aliens* than they do over *law abiding citizens* of the United States is a contention that answers itself. The court's opinion did not discuss *Kent* because *Kent* on its facts was substantially distinguishable from the facts of this case.

In this country we have given aliens very substantial rights, and the courts have been zealous in protecting those rights, *Hampton v. Mow Sun Wong*, 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976), but we have never held that aliens who are in this nation in violation of our laws have all the rights of law abiding citizens of the United States. The difference in the legal status of the individual involved in *Kent* and *Narenji* with respect to their citizenship and compliance with United States laws, thus places

---

1. To the extent that aliens covered by the Regulations are in compliance with our laws the regulation only has a minimal effect upon them and they are *not* subject to deportation.

them in different classes and supports a difference in treatment. This difference in status and the effect of that difference on one's rights under the Immigration Laws was pointed to directly by Justice Douglas, in *Kent, supra,* when he remarked:

"We must remember that we are dealing here with citizens who have neither been accused of crimes nor found guilty. [357 U.S. at 129, 78 S.Ct. at 1119–1120] . . . The grounds for refusal asserted here do not relate to citizenship or allegiance on the one hand or to criminal or unlawful conduct on the other. [357 U.S. at 128, 78 S.Ct. at 1119] . . . *If we were dealing with political questions entrusted to the Chief Executive by the Constitution we would have a different case.*

357 U.S. at 130, 78 S.Ct. at 1120 (Emphasis added). The sentence in italics foreshadowed the President's exercise of his power in foreign affairs in the instant crisis.

Moreover, Congress by statute clearly authorized the Attorney General to prescribe regulations with respect to "nonimmigrants", such as Appellees, who do not properly maintain their status and are required to depart the United States. Congress in 8 U.S.C. § 1184(a) has provided that:

"admission of . . . nonimmigrant [aliens] shall be for such time and under such conditions as the Attorney General may by regulations prescribe, including . . . such conditions as the Attorney General shall prescribe, to insure that at the expiration of such time, or *upon failure to maintain the status under which he was admitted, or to maintain any status subsequently acquired under Section 248,* such alien will depart from the United States."

8 U.S.C. § 1184(a) (Emphasis added). The regulation here in question is so clearly authorized by this statute, and the other statutes referred to in the majority opinion, that petitioners do not present any substantial question by its argument in this case.

Petitioners real objection is to the manner in which the Attorney General through the Regulation has chosen to determine whether those in petitioners' class have maintained their status. The Regulation requires petitioners and others similarly situated to report and only those in violation of law are subject to being sent home. There is nothing novel or illegal about requiring aliens to report. That is the usual requirement which is applied to aliens of all classes. 8 U.S.C. § 1305. The major difference here is one in slightly accelerated timing which is necessitated by the urgency of the present emergency involving Iran. Such regulation is well within the prosecutorial discretion vested in the Attorney General under his duty to *enforce* the Immigration Laws. Those statutes charge, "The Attorney General shall be charged with the administration and *enforcement* of this [Immigration and Nationality] Act . . . He shall *establish such regulations*; *prescribe such* . . . *reports*; . . . and perform such other acts *as he deems necessary for carrying out his authority under the provisions of this Act.*" 8 U.S.C. § 1103(a). (Emphasis added)

Additional authority, previously referred to, for the Regulation promulgated by the Attorney General stems from 8 U.S.C. § 1303 which provides:

"(a) . . . the Attorney General is authorized to prescribe *special regulations* and forms for the *registration* and fingerprinting *of* . . . *(5) aliens of any* . . . *class not lawfully admitted to the United States for permanent residence.*" (Emphasis added).

Petitioners here are not admitted for permanent residence and have definitely been made a special "class" separate from nonimmigrants of other nations by virtue of the violent and lawless acts which their Government has allowed to be committed against the United States and its envoys duly accredited to Iran. These facts clearly bring the Attorney General's Regulation within the statutory power vested in him by the statutes cited above.

Petitioners also assert that the court's opinion "nowhere indicates how the national identity of non-immigrant students is 'reasonably related' to the obligation of the Attorney General to assure that non-immigrant students are maintaining the lawful-

ness of their status in the United States and will depart this country when required. (Page 748). This statement, which professes to state the issue here, chooses to ignore the principal fact in the problem, i. e., that the Regulation is confined to *Iranian* students whose government in violation of all international law, 1 Oppenheim, *International Law*, § 386, p. 789, has violently infringed in Iran upon the inviolability of over 50 of our diplomatic envoys in that country by countenancing their arrest by so-called "students" and imprisonment as hostages to demands that are beyond the constitutional power of this nation to fulfill. If under such strained circumstances between Iran and the United States, the reasonable relationship of the regulation to the departure of illegal *non-immigrant aliens* who owe their allegiance to Iran, and to the determination of the location of other non-immigrant Iranian nationals, is not self evident, petitioners are being opaque. The international crisis and confrontation in Iran is of such severity that those who are illegally in this country create a clear and present danger because of their allegiance and illegal status. Under the circumstances it is reasonable even as to those aliens who are legally here but profess their allegiance to Iran, that they should be located in case the international crisis worsens, so that the Government may immediately take proper security measures to protect against the dangers which all aliens of such a foreign nation potentially create under such circumstances.

Petitioners also contend that the Regulation amounts to a "discriminatory classification" of those in their class. The basis for the separate classification and its reasonableness is set forth in the concurring opinion and petitioners have not even attempted to attack or answer that explanation. To repeat, the classification of non-immigrants from Iran, and particularly those who are here illegally, is valid and reasonable because they owe allegiance to Iran and Iran at the present time is the *only* nation that has with force and violence transgressed upon American property and imprisoned our diplomatic envoys as hostages in violation of our treaty and international law. I will not further point out the status of such acts under international law except to state that they justify more extreme action than is called for by the Regulation.

Petitioners argue, in effect, that non-immigrant Iranians must be treated the same as all other non-immigrants in the United States. The argument is absurd. In view of the acts of the Iranian Government against the United States and our accredited diplomats, non-immigrant Iranians in the United States at this time, and particularly those who are here illegally, are no more entitled to be treated the same as other non-immigrants than non-immigrants of any other nation would be entitled after their country has committed hostile acts against the United States.

It should also be recognized that prior to the issuance of the Regulation in question the President by Executive Order 12170 of November 14, 1979 did "declare a national emergency to deal with . . . the situation in Iran [which] *constitutes an unusual and extraordinary threat to the national security*, foreign policy and economy of the United States." Authority: International Emergency Economics Powers Act, 50 U.S.C.A. Sec. 1701 et seq., the National Emergencies Act, 50 U.S.C. Sec. 1601 et seq., and 3 U.S.C. Sec. 301. 44 Fed.Reg. No. 222 Thursday, November 15, 1979. (Deft's. Ex. 4). (Emphasis added)

The argument is advanced that the Regulation deals improperly with Iranian *students*. The sympathy implicit in that characterization is misplaced. Those who are primarily affected and might be subject to deportation (unless they asked for asylum, delay for valid reasons, or raised compassionate considerations) would be sent home precisely because they are *not* students. As with the so-called *students* in Iran, that are blamed for all the mob action that the Government of Iran does not oppose, these *students* appear to be of the non-studying kind. How they continue to be students eludes me. A student by definition is one who is enrolled and attends educational classes. Those who are the object of this regulation, were admitted for that purpose, but they have not maintained their status as *students*. Hence, having ceased to be

valid students, if they ever acquired that status, the basis upon which they were allowed to enter this country has ceased to exist and they are required to return home. This is not punishment, but merely carrying out the understanding to which they agreed when they were allowed to enter the United States. If the illegal Iranian non-immigrants who are the principal focus of this Regulation are still referred to as *students*, even though they do not attend classes, then the term student is being misused.[2]

In closing I wish to state that because of the authorities I have set forth previously, I disagree with the dissent which suggests that the President's action should be subjected to further "close scrutiny". In the circumstances this is tantamount to seriously questioning the President's action. It should be pointed out, however, that the question has already received full consideration and more than sufficient time has passed to give the questions full consideration. It is also incorrect to say "that the President has taken this action without express authorization from Congress." (Dissent, n. 4). In the situation with which we are here dealing, the President's power is at its zenith—right up to the brink of war and he does act pursuant to the "express authorization" of Congress. The relevant statute provides that whenever "any citizen of the United States has been unjustly deprived of his liberty by or under the authority of any foreign government . . . if [their] release is unreasonably delayed or refused, the President *shall* use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate the release . . .". This expressly covers the holding of United States citizens as hostages.

The foregoing Presidential authority has been in existence since the Act of July 27, 1868, R.S. 2001, 15 Stat. 224 which presently appears as Title 22, U.S.C. § 1732. In its entirety it provides:

Whenever it is made known to the President that any citizen of the United States has been unjustly deprived of his liberty by or under the authority of any foreign government, it shall be the duty of the President forthwith to demand of that government the reasons of such imprisonment; and if it appears to be wrongful and in violation of the rights of American citizenship, the President shall forthwith demand the release of such citizen, and if the release so demanded is unreasonably delayed or refused, the President shall use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate the release; and all the facts and proceedings relative thereto shall as soon as practicable be communicated by the President to Congress.

This direction to the President by Congress is unequivocal. It completely supports every act and order that he has taken to free the United States hostages. No further scrutiny of his acts is required or necessary.

I therefore vote to deny rehearing.

Joint statement of Chief Judge J. SKELLY WRIGHT and of Circuit Judges SPOTTSWOOD W. ROBINSON, III, WALD and MIKVA setting forth their reasons for voting to rehear these cases en banc.

Under challenge in these cases is an *executive decision* to enforce an immigration

---

**2.** In reply to the amicus brief it should merely be added that it places too much reliance on dissenting opinions. It also incorrectly assumes that non-immigrant aliens who are illegally in the country have some right to remain here without being subject to due process deportation hearings, which is all the subject regulation requires them to face.

The assertion that the presence of subject illegal aliens does not "in some way [constitute] a clear and present danger to the welfare of the United States or its citizens" is controverted by the ruling of this court on November

19, 1979, in No. 79–2359, *Jackalone v. Andrus*, "that a demonstration at Lafayette Park has an unacceptable potential for danger to the hostages now being held in the American Embassy in Tehran." Their allegiance to their mother country implicitly creates such hazard. Notice can also be taken of other instances elsewhere in the country where aliens with such allegiance have resorted to mob action in support of the policies being presently carried on in their mother country. Federal Rules of Evidence, Rule 201(b).

statute selectively against a group of aliens because of the conduct of their parent country, thus affecting them solely on the basis of their nationality.[1] Such selective law enforcement poses a novel and serious question implicating an equal protection component of Fifth Amendment due process.[2] Because we believe the question is of exceptional importance,[3] we have voted in favor of *en banc* reconsideration.

There can be no doubt but that Congress has broad authority,[4] which it may vest in the Executive, to limit immigration on a variety of bases, including nationality.[5] But once an alien has taken up residence in the United States, even temporarily, he or she derives substantial protection from the Constitution and laws of this land.[6] It may be that the President, in these troubled days, has the power to decide that our deep aversion to selective law enforcement against a group solely on the basis of their country of origin must give way to some other imperative.[7] The Supreme Court has

---

1. *Narenji v. Civilleti,*. No. 79–2460 (D.C. Cir. Dec. 27, 1979), at 2–3.

2. See *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

3. Rehearing *en banc* "is not favored and ordinarily will not be ordered except (1) when consideration by the full court is necessary to secure or maintain uniformity of its decisions, or (2) when the proceeding involves a question of exceptional importance." Fed.R.App.P. 35(a). There is no serious claim of decisional conflict within the circuit.

4. The fact that the President has taken this action without express authorization from Congress is a significant factor in the Constitutional balance. Even the cases upholding the right of the Executive, acting pursuant to congressional authorization, to exercise virtually unfettered discretion in expelling "undesirable aliens from the United States have approved expulsion only upon a specific claim that the alien has acted in a manner contrary to the interests of the United States. See, *e. g., Shaughnessy v. Mezei,* 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953). By way of contrast, in *Kent v. Dulles,* 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958), the Court refused to sanction the withholding of a passport—a power usually deemed discretionary—absent a state of war or a showing that the individual denied the passport was actually engaged in illegal conduct.

5. As the Court stated in *Yamataya v. Fisher (The Japanese Immigrant case),* 189 U.S. 86, 97, 23 S.Ct. 611, 613, 47 L.Ed. 721 (1903):

   That Congress may exclude aliens of a particular race from the United States; prescribe the terms and conditions upon which certain classes of aliens may come to this country; establish regulations for sending out of the country such aliens as come here in violation of law; and commit the enforcement of such provisions, conditions, and regulations exclusively to executive officers, without judicial intervention,—are principles firmly established by the decisions of this court.

6. Thus the Court has said that immigration statutes may have "the effect of precluding judicial intervention in deportation cases *except insofar as . . . required by the Constitution.*" *Heikkila v. Barber,* 345 U.S. 229, 234–235, 73 S.Ct. 603, 606, 97 L.Ed. 972 (1953) (emphasis added). The Court recently observed that the cases "generally reflect a close scrutiny of restraints imposed by States on aliens," and that although "we have never suggested that such legislation is inherently invalid, . . . the Court has treated certain restrictions on aliens with 'heightened solicitude,' . . . a treatment deemed necessary since aliens . . ˙. have no direct voice in the political processes." *Foley v. Connelie,* 435 U.S. 291, 294, 98 S.Ct. 1067, 1070, 55 L.Ed.2d 287 (1978). The Court has reminded us that in the immigration field, as elsewhere, "[i]t is clear, of course, that no Act of Congress can authorize a violation of the Constitution." *Almeida-Sanchez v. United States,* 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973).

7. In *Hirabayashi v. United States,* 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943), the Court upheld a curfew for citizens of Japanese descent but cautioned:

   Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality. For that reason, legislative classification or discrimination based on race alone has often been held to be a denial of equal protection. . . . *We may assume that these considerations would be controlling here were it not for the fact that the danger of espionage and sabotage, in time of war and of threatened invasion, calls upon the military authorities to scrutinize every relevant fact bearing on the loyalty of populations in the danger areas.*

   *Id.* at 100, 63 S.Ct. at 1385 (emphasis added). In *Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944), the Court emphasized that "[n]othing short of apprehension by the proper military authorities of the *gravest*

certainly suggested that Congress has that power.[8] Nevertheless, the question requires close scrutiny, and our answer must reflect careful consideration of "fine, and often difficult, questions of values."[9]

We presently have no settled opinion on the propriety of the action attacked here. These cases do, however, raise a grave constitutional issue. When the rule of law is being compromised by expediency in many places in the world, it is crucial for our courts to make certain that the United States does not retaliate in kind. We think rehearing by the full court is appropriate and necessary.

*imminent danger to the public safety* can constitutionally justify" such restrictions. *Id.* at 218, 65 S.Ct. at 195 (emphasis added). And see *Ex parte Endo*, 323 U.S. 283, 65 S.Ct. 208, 89 L.Ed. 243 (1944).

8. In *Harisiades v. Shaughnessy*, 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586 (1952) the Supreme Court discussed the ambiguity of the position of aliens, pointing out that the alien brings with him

a foreign call on his loyalties which international law not only permits our government to recognize but commands it to respect. . . . Though the resident alien may be personally loyal to the United States, if his nation becomes our enemy his allegiance prevails over his personal preference and makes him also our enemy, liable to expulsion or internment, and his property becomes subject to seizure and perhaps confiscation. But it does not require war to bring the power of deportation into existence or to authorize its exercise. Congressional apprehension of foreign or internal dangers short of war may lead to its use. So long as the alien elects to continue the ambiguity of his allegiance his domicile here is held by a precarious tenure.

9. *Foley v. Connelie*, 435 U.S. 291, 244, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978) (upholding New York State's exclusion of aliens from the police force).