Imelda Contreras DE AVILIA, Fidel Ocampoocampo, Candelario Escobar De Ocampo et al., Plaintiffs-Appellees and Cross-Appellants,

v.

Benjamin CIVILETTI et al., Defendants-Appellants and Cross-Appellees.

Nos. 80–1590, 80–1680 and 80–1681.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 4, 1980.

Decided March 10, 1981.

Rehearing and Rehearing En Banc Denied June 8, 1981.

Kristine Poplawski, Legal Asst. Project., Leg. Asst. Found, Chicago, Ill., for plaintiffs-appellees and cross-appellants.

Lauri Steven Filppu, Dept. of Justice, Washington, D. C., for defendants-appellants and cross-appellees.

Before CUMMINGS and WOOD, Circuit Judges, and BARTELS, Senior District Judge.*

BARTELS, District Judge.

This is an appeal by the United States Government and by the plaintiffs, a group

---

* The Honorable John R. Bartels, Senior United States District Judge for the Eastern District of    New York, sitting by designation.

of Mexican visa applicants, from an amended final order and permanent injunction against the application by the State Department of its interpretation of the Immigration and Nationality Act Amendments of 1976, P.L. No. 94–571, 90 Stat. 2703–2707, *amending* 8 U.S.C. §§ 1101 *et seq.* ("the 1976 amendments").

The 1976 amendments imposed a limitation of 20,000 per fiscal year on immigration from any Western Hemisphere country.[1] The government's fiscal year runs from October 1 to September 30, but the 1976 amendments did not become effective until January 1, 1977, after one full quarter of fiscal year 1977 had expired. During that first quarter, 14,203 visas were issued to Mexicans pursuant to the immigration system which prevailed in the Western Hemisphere before the new law became effective. The State Department nevertheless charged those visas against the newly-imposed national quota of 20,000, leaving only 5797 visas available for Mexican immigrants between January 1 and September 30, 1977, of which 5435 were actually issued.[2]

A group of Mexican visa applicants and their sponsoring relatives ("the applicants")

filed a class action in the United States District Court for the Northern District of Illinois, claiming that the State Department's[3] application of the per country quota resulted in an underallocation of visas to them in fiscal year 1977, in that the first quarter visas should not have been charged against Mexico's annual allotment. The applicants sought "recapture" of 13,366 unissued visas for the benefit of class members currently on the immigrant waiting list.

The district court held that the State Department should not have charged, against the 20,000 limitation, visas issued in the Western Hemisphere prior to the effective date of the 1976 amendments, January 1, 1977, and that the quota should have been applied *pro rata* to the three quarters of fiscal year remaining after that date. Under this construction 15,000 visas should have been issued to Mexicans between January 1 and the end of the fiscal year on September 30, 1977. Accordingly, the trial judge ordered the recapture of 9565[4] visas for the benefit of the plaintiff class. Since there were conflicting interests among the applicants as to the proper allocation of recaptured visas, the judge certified two subclasses to argue this issue.[5] He adopted

1. The Western Hemisphere is defined as North America (including Central America), South America and adjacent islands. 22 C.F.R. § 42.1 (1980).

2. As a result of procedures in the visa issuance system not at issue here, actual issuances do not always match the authorized level of allocation.

3. Named as defendants in this action are the United States Department of State, the Secretary of State, the Department of Justice and the Attorney General, the Immigration and Naturalization Service and its commissioner. In the discussion, however, only the State Department, whose policy has given rise to this lawsuit, will be mentioned.

4. The district court allocated 15,000 visas to Mexicans from January 1 to September 30, 1977, but the State Department actually issued only 5435 visas to Mexicans during this period. The difference between the two figures is 9565.

5. The first subclass consisted of "preference" applicants, and was defined to include:

All current preference immigrant visa applicants who are natives of Mexico, and all United States citizens or permanent residents who are relatives of those Mexican visa applicants who established their entitlement to preference status on the basis of such familial relationships.

The second subclass consisted of "non-preference" applicants, and was defined to include:

All current non-preference immigrant visa applicants who are natives of Mexico, and all United States citizens or permanent residents who are relatives of those Mexican visa applicants who established their entitlement to non-preference status on the basis of such familial relationships.

The terms "preference status" and "non-preference status" refer to the visa applicant's entitlement, or non-entitlement to a preference under the eight category system provided for allocation of visas in section 1153(a) of the Immigration and Nationality Act, *See* note 7, *infra,* and accompanying text.

The two subclasses had adversary interests in the relief ordered because any visas recaptured would have to be allocated in accordance with section 1153(a).

a formula for allocation of the recaptured visas, and ordered injunctive relief providing, *inter alia*, that applicants in this country who were likely to receive visas pursuant to the court's decision could not be deported pending their issuance. All parties have appealed, seeking reversal of all or part of the district court's disposition of the case. We are required to interpret a statute which, because of its effective date of January 1, 1977, purporting to cover the fiscal year beginning October 1, 1976, has created an ambiguous gap as to the application of visas issued before January 1, 1977 against the limitation of 20,000.

*Immigration System Prior to the 1976 Amendments*

To understand the action of the State Department and its adoption of the challenged construction of the 20,000 per country limit, it is necessary to appreciate the context of the problem through a brief history of the provisions of the Immigration and Nationality Act, 8 U.S.C. §§ 1101 *et seq.* ("the Act") both before and immediately after[6] the effective date of the 1976 amendments thereto, January 1, 1977. Prior to that date, immigration to this country was governed essentially by the Act of October 3, 1965, 79 Stat. 911–922 ("the 1965 amendments") which amended the basic Immigration and Nationality Act of 1952. Under the 1965 amendments what amounted to a dual system applied to immigration from the Eastern and Western Hemispheres respectively.

Immigration from the East was subject to an overall annual limitation of 170,000, 8 U.S.C. § 1151(a) (1970), while the annual fiscal year quota from the Western Hemisphere was 120,000. Section 21(e) of the 1965 amendments. The law also accorded different preferences to eight categories of Eastern Hemisphere visa applicants according to their familial relationship with United States citizens or permanent residents, possession of certain professional skills, or refugee status. 8 U.S.C. § 1153(a)(1)–(8).[7] Each of seven so-called "preference" categories was allocated a percentage of the overall hemispheric quota, and those preferences based on family ties to United States citizens or permanent residents were also entitled to unused visas from a higher category. The eighth, so-called "non-preference" category received only visas unused by the seven preference groups. In addition to the 170,000 limit on immigration from the Eastern Hemisphere as a whole, the 1965 amendments provided that the number of immigrants from any Eastern country not exceed 20,000 per fiscal year. 8 U.S.C. § 1152(a) (1970).

The provisions governing immigration from Western Hemisphere nations were markedly different from those in effect with respect to the rest of the world. Although immigration from this hemisphere was limited to 120,000 per fiscal year, this limitation was not incorporated into the Immigration and Nationality Act itself. Moreover, Western Hemisphere immigrants were defined as "special immigrants", 8 U.S.C. § 1101(a)(27) (1970), and were not subject to any annual per country quota. 8 U.S.C. § 1153(a) (1970). In the absence of

---

**6.** The Immigration and Nationality Act has been further amended since 1976, effecting changes not here germane.

**7.** Paraphrased, the preference categories set out in 8 U.S.C. § 1153(a) are as follows:
   (1) unmarried children of United States citizens: 20%;
   (2) spouses and unmarried children of permanent residents: 20%, plus any unused visas from category (1);
   (3) "members of the professions, or [those] who because of their exceptional ability in the sciences or the arts will substantially benefit prospectively the national economy, cultural interests, or welfare of the United States" and whose services are sought by a United States employer: 10%;
   (4) married children of United States citizens: 10% plus any unused visas from preferences (1)–(3);
   (5) siblings of United States citizens over twenty-one years old: 24%, plus unused visas from categories (1)–(4);
   (6) immigrants capable of performing certain jobs for which a shortage of labor exists in this country: 10%;
   (7) conditional entries made available to refugees by the Attorney General: 6%;
   (8) residual category [non-preference]: unused visas from preferences (1)–(7).

such a limitation, Mexico annually accounted for 40–45,000 immigrants per year, or upwards of a third of the overall hemispheric quota.

The eight category preference system set out in section 1153(a) of the Act did not apply to Western Hemisphere visa applicants either. Instead, such applicants were required to obtain a labor certification from the United States Secretary of Labor, or show exemption from this requirement based on certain familial relationships to United States citizens or permanent residents. 8 U.S.C. § 1182(a)(14) (1970). Congress did not establish a system for processing special immigrants and the State Department administratively established the policy of processing such visa applicants in strict chronological order according to the "priority date" on which they had either obtained a labor certification or submitted documentation showing exemption therefrom. 22 C.F.R. §§ 42.62, 42.63 (1975).

*Changes by the 1976 Amendments*

The Immigration and Nationality Act Amendments of 1976 wrought a number of changes in the Act. In effect, the special legislation that had governed the Western Hemisphere was repealed, and Western Hemisphere immigrants were made subject to the same immigration system that had governed the rest of the world since 1965. The most significant change that the 1976 amendments accomplished was the imposition on the Western Hemisphere of the 20,000 limitation on immigration from any one country and along with it the eight category preference system theretofore applicable only in the Eastern Hemisphere.[8] While the 120,000 Western Hemispheric quota remained in effect, section 1152(a) of the Act, now applicable to both hemispheres, provided that:

> [T]he total number of immigrant visas ... *made available* to natives of any single foreign nation *under paragraphs (1) through (8) of section 1153(a) of this*

*title shall not exceed 20,000 in any fiscal year.*

8 U.S.C. § 1152(a) (1976) (emphasis added).

This dispute arises from the fact that section 1152(a) did not indicate whether visas issued to special immigrants in the first quarter of fiscal year 1977 were to be counted towards the 20,000 quota. The 14,203 visas issued to Mexicans in that time had clearly not been "made available ... under ... section 1153(a)" as that provision was not yet in effect with respect to the Western Hemisphere. The State Department nevertheless adopted a policy (the "cross-systems charging policy") of counting the first quarter visas towards each Western Hemisphere country's national quota. As a result, only 5797 visas were allocated to Mexico in the final three quarters of the fiscal year, of which only 5435 were actually issued. Due to administrative difficulties in implementing the new system in the first year of its operation, actual visa issuances in the Western Hemisphere in fiscal year 1977 fell short by 13,366 of the hemispheric quota. It was these unissued visas that the plaintiffs sought to recapture in their lawsuit.

*Discussion*

The imposition on Western Hemisphere countries after the beginning of the fiscal year of a quota manifestly intended to apply on a full fiscal-year basis created an ambiguity in the Act as to visas issued in the first quarter of fiscal year 1977. As the district court noted in its opinion, three solutions to this ambiguity are possible. The approach adopted by the State Department was to charge all visas issued in the fiscal year against the quota, despite the absence of an explicit mandate for doing so. The plaintiffs, on the other hand, advocate giving no effect at all to the quota with respect to the first quarter of the fiscal year. In their view, a full 20,000 visas should have been issued to Mexicans in the

---

**8.** A savings clause provided that those on immigration waiting lists as of the effective date of the 1976 amendments would be treated as lowest priority, "non-preference" applicants under the amended Act, with the right to show entitlement to a higher preference. Section 9(b) of the Immigration and Nationality Act Amendments of 1976 (1976).

last three quarters of fiscal year 1977. The third resolution, and the one adopted by the district court, was to apply the 20,000 quota on a *pro rata* basis over the portion of fiscal year 1977 during which the 1976 amendments were effective, so that ¾ of 20,000, or 15,000 visas would be allocated to Mexicans during the last three quarters of the fiscal year.

█ In choosing among these different approaches, it becomes necessary to ascertain and effectuate the legislative purpose in enacting the 1976 amendments. *Philbrook v. Glodgett*, 421 U.S. 707, 95 S.Ct. 1893, 44 L.Ed.2d 525 (1975). To that end, it is important to note that the interpretation of the State Department, the agency statutorily entrusted with administration of the Immigration and Nationality Act, 8 U.S.C. § 1104, is entitled to substantial deference, *Quern v. Mandley*, 436 U.S. 725, 738, 98 S.Ct. 2068, 2076, 56 L.Ed.2d 658 (1978), and should be followed "unless there are compelling indications that it is wrong." *New York State Department of Social Services v. Dublino*, 413 U.S. 405, 421, 93 S.Ct. 2507, 2517, 37 L.Ed.2d 688 (1973) (quoting *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969)). With these principles in mind, we examine the validity of the three possible interpretations.

█ The State Department's responsibility for administering the Immigration and Nationality Act includes the provisions relating to numerical limitations on immigration. 8 U.S.C. §§ 1104, 1152(b)&(d), 1153(e). In construing its obligations the State Department relies primarily on the legislative history of the 1976 amendments to support its cross-systems charging policy. It is clear from the following language in House Report No. 94–1553, U.S.Code Cong. & Admin.News 1976, 6073, which accompanied the bill, that Congress intended to eliminate disparities in immigration matters among Western Hemisphere countries and between the two hemispheres, ensuring that all nations be treated alike:

During the 94th Congress, a general consensus has been reached that the 20,-000 per country limit should be extended to all countries of the world, including those geographically contiguous to the United States. Such a provision is included in the Administration's immigration bill. H.R. 10323, in contrast to Administration support during the 93rd Congress of a 35,000 allotment for the contiguous countries . . . .

The decision by this Committee to limit all countries to 20,000 has been based primarily on the desire that this legislation mark the final end of an immigrant quota system based on nationality, whether the rationale behind it be the alleged national origins of our citizenry, as it was in the past, or geographical proximity—the argument previously advanced for preferential treatment of Canada and Mexico. The proposed legislation rejects the concept of a "special relationship" between this country and certain other countries as a basis for our immigration law, in favor of a uniform treatment for all countries.

H.R.Rep. No. 94–1553, 94th Cong., 2d Sess. 8–9, *reprinted in* [1976] U.S.Code Cong. & Adm.News 6080–81.

In considering an earlier bill to amend the Immigration and Nationality Act, the House rejected a provision giving Mexico a 35,000 annual limitation, as opposed to the generally applicable 20,000 limit. 119 Cong. Rec. 31456–64. The State Department thus argues that it would have violated the clearly-expressed Congressional intent that immigration from no country exceed 20,000 per year, if it had allocated more than 5797 visas to Mexicans in the final three quarters of fiscal year 1977.

The plaintiffs, in support of their position, cite the plain language of section 1152(a), which limits to 20,000 per year only those visas issued pursuant to section 1153(a). They point out that the 14,304 visas issued to Mexicans in the first quarter of fiscal year 1977 were not made available pursuant to section 1153(a), as that provision was not in effect until January 1, 1977, after the first quarter of the fiscal year had expired. Invoking the maxim of statutory

interpretation *expressio unius est exclusio alterius*, they contend that by mentioning only visas issued pursuant to § 1153(a), Congress meant to exclude from the 20,000 quota visas issued under the pre-1976 amendments system. They further contend that the State Department's cross-systems charging policy gave retroactive effect to the quota by applying it to visas issued before its effective date, interfering with their "settled expectations" and "antecedent rights" to the issuance of visas. Citing settled immigration practice that numerical limits on visa issuance are also mandatory levels that must be reached, *Silva v. Bell*, 605 F.2d 978, 988 (7th Cir. 1979), the applicants claim that they were entitled to the issuance of a full 20,000 visas in that portion of fiscal year 1977 during which the 1976 amendments were in effect.

The district court held that the State Department's interpretation of the 1976 amendments was "both unreasonable and contrary to Congressional intent", stressing that the 14,203 visas issued to Mexicans in the first quarter of fiscal year 1977 were not required by the literal language of section 1152(a) to be counted towards the national quotas. The district court reasoned that the quota applied only to those visas "made available" under the preference system as applied to Western Hemisphere immigrants for the first time on January 1, 1977, and thus did not include visas issued between October 1, 1976 and December 31, 1976. Acknowledging that the 1976 amendments' legislative history indicated Congress' desire to limit all countries to 20,000 visas annually, the court concluded that this objective had no effect prior to the amendments' effective date, January 1, 1977. In its view, the cross-systems charging policy amounted to an impermissible retroactive application of the quota.

The district judge thus agreed with the plaintiffs that the State Department's ap-plication of the 1976 amendments was unlawful. Unlike the applicants, however, the judge, in his construction of the Act, did take account of the fact that one quarter of the fiscal year had elapsed when the 1976 amendments became effective. He noted that section 2 of the 1976 amendments, 8 U.S.C. § 1151(a), provided that visa issuance should proceed at a more or less uniform rate over the course of the year,[9] and concluded that issuing a full year's quota to Mexicans in the final three quarters of fiscal year 1977 would constitute preferential treatment by allowing them to immigrate at a rate faster than that enjoyed by immigrants from other countries. The trial court held that the proper application of the 20,000 quota was to prorate it over the final three quarters of the fiscal year, and decided that members of the plaintiff class were entitled to 9565 additional visas.

While the district court's *pro rata* approach is a more plausible interpretation of the statute than the applicants', neither interpretation justifies the conclusion that the State Department's cross-systems charging policy was unreasonable. Indeed, the applicant's proposed construction is the poorest choice because it ignores the legislative history altogether. Plaintiffs and the district court were too prone to conclude that Congress' failure to refer to "special immigrant" visas in imposing the 20,000 limitation indicated its intention that such visas not be counted towards the fiscal year quota. Their argument assumes that Congress considered and rejected the option of counting those visas, *Tri-State Terminals, Inc. v. Jesse*, 596 F.2d 752, 755 n.2 (7th Cir. 1979), an assumption which is untenable in this case. It is, however, obvious that Congress in the 1976 amendments through inadvertence failed to inform the State Department how to administer during a fraction of the fiscal year a statute designed to apply on a full fiscal year basis.[10]

---

9.  Section 1151(a) of the Act in effect provides that visas are not to be issued at a rate exceeding approximately one quarter of the hemispheric quota per quarter of the fiscal year.

10.  It is relevant to note that the provision imposing the quota was not drafted specifically for Western Hemisphere countries. In fact, it had been in effect with respect to the rest of the world since 1965. It was simply extended by the 1976 amendments to the Western Hemisphere.

Where the problem of interpretation concerns a situation apparently not foreseen by the legislators, it is appropriate to consult those areas covering the same subject where expression of the legislative intent is clear, and extrapolate therefrom. *Montana Power Co. v. FPC*, 445 F.2d 739 (D.C.Cir.1970) (*en banc*), *cert. denied*, 400 U.S. 1013, 91 S.Ct. 566, 27 L.Ed.2d 627 (1971). We believe Congress clearly intended that the 1976 amendments impose the same ceiling on immigration from all countries whether from the Eastern or Western Hemisphere. H.R.Rep. No. 94–1553, *supra*. By the time the State Department confronted the problem of applying the 1976 amendments to Western Hemisphere immigrants in mid-fiscal year, a large waiting list of applicants had developed, and it had no reason to expect that the 120,000 hemispheric quota would not be reached regardless of which interpretation it adopted. In a situation like this, where there were apparently not enough visas to satisfy Western Hemisphere demand, the State Department had to formulate a policy consistent with the aim of equalizing treatment of all countries. The approach it adopted avoided issuing more than 20,000 visas to nationals of any one country within the fiscal year, unlike that of either plaintiffs or the district court.

Counting visas issued during the first quarter of fiscal year 1977, before the effective date of the 1976 amendments, did not amount to a retroactive application of the quota. Visa applicants have no vested right in the issuance of a visa. *Knauff v. Shaughnessy*, 338 U.S. 537, 542, 70 S.Ct. 309, 312, 94 L.Ed. 317 (1950); *compare Greene v. United States*, 376 U.S. 149, 159–60, 84 S.Ct. 615, 621–622, 11 L.Ed.2d 576 (1964). Since the cross-systems charging policy had no effect on visas already issued, it did not interfere with the "settled expectations" of any person. The State Department's application of the 1976 amendments is not rendered retroactive "merely because the facts or requisites upon which its subsequent action depends . . . are drawn from a time antecedent to the enactment." *Reynolds v. United States*, 292 U.S. 433, 449, 54 S.Ct. 800, 803, 78 L.Ed. 1353 (1943).

The dispute in this case arises from the gap in the 1976 amendments caused by Congress' inadvertent failure to require that Western Hemisphere visas issued in the first quarter of fiscal year 1977 be charged against the 20,000 quota. The result of such a mistake should not be given effect when to do so would pervert the manifest purpose of the statute as a whole. *United States v. Brown*, 333 U.S. 18, 26, 68 S.Ct. 376, 380, 92 L.Ed. 442 (1948); *In re Adamo*, 619 F.2d 216, 222 (2d Cir. 1980); *United States v. Babcock*, 530 F.2d 1051, 1053 (D.C. Cir.1976). A literal interpretation of the 1976 amendments must yield to clear contrary evidence of Congressional intent. *Nat'l Railroad Passengers Corp. v. Nat'l Assoc. of Railroad Passengers*, 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974); *United States v. Campos-Serrano*, 404 U.S. 293, 298, 92 S.Ct. 471, 474–475, 30 L.Ed.2d 457 (1971).

We conclude that the State Department's cross-systems charging policy was both reasonable and consistent with the Congressional desire to eliminate disparities in immigration among all countries. To give effect to that objective, it was reasonable for the State Department to count visas issued in the first quarter of fiscal year 1977, although they had not been "made available" under paragraphs (1) through (8) of section 1153(a), which was not in effect with respect to the Western Hemisphere until January 1, 1977.

Accordingly, we hold that the district court erred in deciding that the State Department's cross-systems charging policy was unlawful. Under the circumstances, it is unnecessary to reach the other issues on appeal.

The district court's memorandum decision of May 18, 1979 is reversed, and the Amended Final Order and Permanent Injunction are dissolved.