45 F.3d 469
 310 U.S.App.D.C. 168
 LEGAL ASSISTANCE FOR VIETNAMESE ASYLUM SEEKERS; Thua Van Le;
Em Van Vo; Thu Hoa Thi Dang; Truc Hoa Thi Vo, Appellants
v.
DEPARTMENT OF STATE, BUREAU OF CONSULAR AFFAIRS, et al., Appellees.
 No. 94-5104.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 4, 1994.
Decided Feb. 3, 1995.
As Amended Feb. 3, 1995.
 
 Appeal from the United States District Court for the District of Columbia, No. 94cv00361.
 Daniel Wolf, Washington, DC, argued the cause for appellants. With him on the briefs were William R. Stein and Robert B. Jobe, Washington, DC.
 Bernadette C. Sargeant, Asst. U.S. Atty., Washington, DC, argued the cause for appellees. With her on the brief were Eric H. Holder, Jr., U.S. Atty., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., Washington, DC.
 Before EDWARDS, Chief Judge, and SENTELLE and RANDOLPH, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SENTELLE.
 Dissenting opinion filed by Circuit Judge RANDOLPH.
 SENTELLE, Circuit Judge:
 
 
 1
 This is an appeal from a grant of summary judgment by a not-for-profit corporation, Legal Assistance for Vietnamese Asylum Seekers, Inc. ("LAVAS"); two detained Vietnamese immigrants in Hong Kong; and their American citizen sponsors, against the United States Department of State and various government officials in their official capacities (collectively "the State Department" or "Department"). Appellants allege the State Department violated its own regulations as well as the Immigration and Nationality Act when refusing to process the visa applications of Vietnamese immigrants, who had not been screened in as political refugees, at the United States Consulate in Hong Kong. Because we find the district court erred in granting summary judgment in favor of appellees, we reverse and remand.
 
 I. BACKGROUND
 
 2
 Since April 1975, when the North Vietnamese captured Saigon, large numbers of refugees have fled Vietnam to Hong Kong. Between June 1979 and June 1988, the treatment of these persons was guided by an informal agreement under which Hong Kong and other nations in the region committed themselves to granting temporary refuge in exchange for a commitment from the United States and other western countries to resettle these immigrants. As part of this agreement, the Hong Kong Government accorded these immigrants presumptive refugee status.
 
 
 3
 However, due to an increase in the number of persons fleeing Vietnam in the late 1980s, the Hong Kong Government announced it was revoking the presumptive refugee status of the Vietnamese immigrants as of June 15, 1988. Thereafter, all new arrivals would be detained and screened by local immigration authorities to determine whether they individually qualified for refugee status. In June 1989, this approach was adopted throughout the region in the form of a Comprehensive Plan of Action ("CPA"), a joint statement of policy also adopted by the United States. The CPA provides that asylum seekers who are screened out, that is those who do not qualify as refugees under the criteria established in the Refugee Convention, should return to Vietnam. Once returned, those eligible for immigrant visas may apply through the Orderly Departure Program, established to provide for the departure of Vietnamese directly from Vietnam to their resettlement destinations.
 
 
 4
 The United States permits Vietnamese immigrants, who have as sponsors close relatives who are United States citizens or permanent resident aliens in the United States, to enter as beneficiaries of immigrant visas under the criteria set forth in the Immigration and Nationality Act ("INA"), 8 U.S.C. Secs. 1151-1156 (1988). To obtain a visa, eligible Vietnamese immigrants and their sponsors must complete several steps. First, the sponsor must file a petition with the Immigration and Naturalization Service ("INS"). 8 C.F.R. Sec. 204.1(a) (1994). If the INS approves the petition, the Vietnamese applicant must complete and submit to the United States State Department an application for an immigrant visa. 22 C.F.R. Sec. 42.63(a) (1994). Third, the applicant must provide various documents to a United States consulate, and appear at the consulate for final processing of the visa application. 22 C.F.R. Sec. 42.62(a) (1994).
 
 
 5
 From June 1979 to April 1993, the State Department processed applications for Vietnamese boat people in Hong Kong at the United States consulate. Although the Department directed its posts in November 1991 to advise screened out applicants to return to Vietnam, the United States consulate in Hong Kong ignored this change in policy. The consulate continued to process the visa applications from screened out Vietnamese. To facilitate this processing, the Consulate General issued letters to the Hong Kong Government requesting that Vietnamese be made available for interviews at the consulate.
 
 
 6
 In April 1993, however, after an exchange of cables in which the United States consulate in Hong Kong argued it should be permitted to continue processing those immigrants who had been screened out, the Department specifically instructed the consulate to cease such activity. Applicants who had been screened out were thus required to return to Vietnam for visa processing. The United States consulate officially informed the Hong Kong Government of the policy change on September 24, 1993.
 
 
 7
 On February 25, 1994, appellants brought this action against the State Department and various officials. Appellants sought declaratory and injunctive relief on behalf of a class of Vietnamese nationals desiring to be processed at the United States consulate in Hong Kong, yet who were instructed they would have to return to Vietnam for processing. Appellants also sought such relief on behalf of a class of sponsoring United States citizens and permanent residents who were related to the detained plaintiffs.
 
 
 8
 Appellants alleged that the State Department's change in policy was in violation of the INA and the regulations promulgated thereunder, the Administrative Procedure Act ("APA"), and the United States Constitution. Following a hearing consolidating appellants' application for a preliminary injunction with the trial of the action on its merits, the district court issued a final order on April 28, 1994, granting the State Department's motion for summary judgment and denying appellants' cross motion for summary judgment.
 
 II. DISCUSSION
 
 9
 As a threshold issue, appellees contend all of the appellants lack standing to bring this action. The APA grants standing to any party who is "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. Sec. 702 (1988). See National Fed'n of Fed. Employees v. Cheney, 883 F.2d 1038, 1042 (D.C.Cir.1989). The party must suffer injury in fact, and the interest sought to be protected must arguably be within the zone of interests protected by the statute in question. Clarke v. Securities Indus. Ass'n, 479 U.S. 388, 395-96, 107 S.Ct. 750, 754-55, 93 L.Ed.2d 757 (1987). We first address the issue of whether the sponsoring resident appellants possess standing. Appellants argue these plaintiffs suffer the requisite injury in fact and are within the zone of interest protected by the INA.
 
 
 10
 We agree. First, as to injury in fact, the State Department's conduct prolongs the separation of immediate family members. The detained appellants must either remain in Hong Kong, where they are denied the opportunity to be processed, or, if they are required first to return to Vietnam, their processing will be further delayed. We have previously found injury in fact where the plaintiffs were far less aggrieved than in the case at bar. See, e.g., Abourezk v. Reagan, 785 F.2d 1043, 1050-51 (D.C.Cir.1986) (holding American plaintiffs possess standing where the State Department denied visas to aliens wishing to visit the United States to attend meetings at the behest of these plaintiffs).
 
 
 11
 Second, the resident appellants are within the zone of interest protected by the INA. As the Supreme Court held in Clarke, the zone of interest test does not necessarily require a specific congressional purpose to benefit the would-be plaintiff. It is sufficient if the plaintiffs " 'establish that their particular interest[ ]' " falls within the area of interests Congress intended to protect. National Fed'n of Fed. Employees, 883 F.2d at 1047 (quoting Haitian Refugee Ctr. v. Gracey, 809 F.2d 794, 812 (D.C.Cir.1987)). The INA authorizes the immigration of family members of United States citizens and permanent resident aliens. 8 U.S.C. Secs. 1151-1156. In originally enacting the INA, Congress "implement[ed] the underlying intention of our immigration laws regarding the preservation of the family unit." H.R.Rep. No. 1365, 82d Cong., 2d Sess. (1952), reprinted in 1952 U.S.C.C.A.N. 1653, 1680. Given the nature and purpose of the statute, the resident appellants fall well within the zone of interest Congress intended to protect.
 
 
 12
 Appellees also contend that neither LAVAS nor the detained appellants in Hong Kong have standing. We need not reach this issue. If one party to an action has standing, a court need not decide the standing issue as to other parties when it makes no difference to the merits of the case. See Railway Labor Executives' Ass'n v. United States, 987 F.2d 806, 810 (D.C.Cir.1993) (per curiam).[1]
 
 
 13
 We now turn to the merits of the appeal. Appellants allege the State Department's refusal to process the visas of the detained appellants in Hong Kong violates 22 C.F.R. Sec. 42.61(a) of the Department's visa regulations. The regulation concerns the circumstances under which an immigrant seeking a visa can have his case processed in a given consular district. The parties dispute the proper interpretation of this regulation, but we need not construe the version of the regulation in effect at the time the dispute arose because it has been rendered moot by 1994 amendments to 22 C.F.R. Sec. 42.61(a). Visa applicants have no vested right in the issuance of a visa. De Avilia v. Civiletti, 643 F.2d 471, 477 (7th Cir.1981). They are certainly not entitled to prospective relief based on a no longer effective version of a later amended regulation. It is the amended version which will now govern the admission of the detained Vietnamese, and it is that version we must construe:
 
 
 14
 (a) Alien to apply in consular district of residence. Unless otherwise directed by the Department, an alien applying for an immigrant visa shall make application at the consular office having jurisdiction over the alien's place of residence; except that, unless otherwise directed by the Department, an alien physically present in an area but having no residence therein may make application at the consular office having jurisdiction over that area if the alien can establish that he or she will be able to remain in the area for the period required to process the application....
 
 
 15
 59 Fed.Reg. 39,955 (1994) (to be codified at 22 C.F.R. Sec. 42.61).
 
 
 16
 Under this regulation, an alien desiring a visa shall apply at the consular office where he resides. Alternatively, an alien physically present in an area has the option of applying at the consular office having jurisdiction over that area if he satisfies a precondition.[2] However, asserting its authority under the regulation to "direct otherwise," the Department has ceased processing Vietnamese immigrants in Hong Kong at the consular office. Nationals of other countries not subject to the CPA are still processed at the consular office.
 
 
 17
 Although appellees' regulation permits this differing treatment, appellants claim the discrimination violates 8 U.S.C. Sec. 1152(a) of the INA. This section provides "no person shall ... be discriminated against in the issuance of an immigrant visa because of the person's ... nationality ... or place of residence." Appellants argue that the Department violated the statute in drawing an explicit distinction between Vietnamese nationals and nationals of other countries when refusing to process the visas of the screened out Vietnamese immigrants. Appellants assert this statute compels this court to invalidate any attempt to draw a distinction based on nationality in the issuance of visas. In contrast, appellees urge us to adopt the position that so long as they possess a rational basis for making the distinction, they are not in violation of the statute. Appellees maintain the goal of encouraging voluntary repatriation and the aims of the CPA certainly provide a rational basis for the practices and policies in question.
 
 
 18
 We agree with appellants' interpretation of the statute. Congress could hardly have chosen more explicit language. While we need not decide in the case before us whether the State Department could never justify an exception under the provision, such a justification, if possible at all, must be most compelling--perhaps a national emergency. We cannot rewrite a statutory provision which by its own terms provides no exceptions or qualifications simply on a preferred "rational basis." Cf. Haitian Refugee Ctr. v. Civiletti, 503 F.Supp. 442, 453 (S.D.Fla.1980) (under 8 U.S.C. Sec. 1152(a), INS has no authority to discriminate on the basis of national origin, except perhaps by promulgating regulations in a time of national emergency).
 
 
 19
 Appellees rely on Narenji v. Civiletti, 617 F.2d 745 (D.C.Cir.1979), for the proposition that their nationality-based discrimination passes muster under section 1152(a) as long as they possess a rational justification. In Narenji, we upheld an INS regulation requiring nonimmigrant alien students in the United States who were natives or citizens of Iran to report to an INS office to provide information concerning their nonimmigrant status. Id. at 746-47. The INA delegated to the Attorney General the authority to prescribe conditions of admission to the United States for nonimmigrant aliens. 8 U.S.C. Sec. 1184(a). The INA also authorized the Attorney General to order the deportation of any nonimmigrant alien who failed to comply with the conditions of his status. 8 U.S.C. Sec. 1251(a)(9). We held that a broad mandate of the INA delegating to the Attorney General the authority to prescribe conditions of admission to the United States on the part of nonimmigrant aliens authorized the Attorney General to draw distinctions among nonimmigrant aliens on the basis of nationality. Narenji, 617 F.2d at 747. We then examined whether the regulation violated the Constitution. In finding no violation, we stated that we would sustain classifications on the basis of nationality drawn by the Congress or the Executive in the immigration field, so long as they were not wholly irrational. Id. Appellants argue that Narenji compels us to sustain the distinctions drawn in the present regulations.
 
 
 20
 Appellees' reliance on Narenji is misplaced. In that case the court was considering the power of the Immigration and Naturalization Service to promulgate nationality-based regulations and the constitutionality of such regulations if otherwise properly promulgated. Under constitutional standards we found no equal protection violation. Id. at 748. The Narenji court did not consider the effect on the agency regulatory authority to make distinctions of a statute flatly forbidding nationality-based discrimination. Here the agency's nationality-based regulation runs athwart such a statute. The appellees' proffered statutory interpretation, leaving it fully possessed of all its constitutional power to make nationality-based distinctions, would render 8 U.S.C. Sec. 1152(a) a virtual nullity.
 
 
 21
 Section 1152 is a part of the Immigration and Nationality Act. This is an act committed to the administration of the Immigration and Naturalization Service and we review its interpretations deferentially under the standard of Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). Even under that standard the Service's present interpretation fails. Where Congress has unambiguously expressed its intent, we need go no further. Here, Congress has unambiguously directed that no nationality-based discrimination shall occur. There is no room for the Service's interpretation proffered by the Department.
 
 
 22
 Under the APA, this court is obligated to hold unlawful and set aside agency action found to be not in accordance with law. 5 U.S.C. 706(2)(A) (1988). The interpretation and application of the regulation so as to discriminate against Vietnamese on the basis of their nationality is in violation of the Act, and therefore not in accordance with law.
 
 
 23
 The dissent's contention that the distinction drawn by the Department is the permissible line between legal and illegal immigrants as opposed to the impermissible nationality-based line between Vietnamese and non-Vietnamese illegal immigrants is simply not supported by the record. The case reaches us on appeal from summary judgment. At the summary judgment stage in the district court, the defendants expressly stated in their "Statement in Response to Plaintiffs' Statement of Material Facts as to which there is no Genuine Dispute," that "in approximately April, 1993, the Department changed its practice or policy relating to the processing of immigrant visa petitions of Vietnamese nationals residing illegally in Hong Kong." (Joint Appendix 353) (emphasis added). The Department has never contended here or in the district court that this change was made as to any other nationals than Vietnamese nationals nor that illegally present nationals of other countries would be treated the same as illegally present Vietnamese nationals. We neither hold nor imply that any statute requires that the same treatment be afforded legal and illegal status.
 
 III. CONCLUSION
 
 24
 Accordingly, we reverse the district court's grant of summary judgment in favor of appellees and remand the case for a disposition consistent with this opinion.
 
 
 25
 It is so ordered.
 
 RANDOLPH, Circuit Judge, dissenting:
 
 26
 My objections to the majority opinion are, first, that the decision on the merits is in error, and second, that the prospect of mootness should have precluded any decision on the merits. I realize that discussing the issues in this sequence inverts the usual order. But the majority's mistake on the merits is the more serious in terms of lasting consequences and I shall therefore begin with it.
 
 
 27
 The British crown colony of Hong Kong is one of the most densely populated regions in the world. Within its tiny area, nearly six million people reside. Because of Hong Kong's proximity to Vietnam it has become one of the prime destinations for Vietnamese "boat people," more than 750,000 of whom have fled to the countries of Southeast Asia during the past nineteen years. After the fall of Saigon in 1975, the United States pressed "first asylum" countries such as Hong Kong to provide a safe haven for these people until they could be resettled elsewhere or returned to Vietnam. But as the years passed, the influx of boat people continued. Since June 1988, more than 71,000 individuals from Vietnam have arrived on Hong Kong's shores and wound up in its detention camps. In an effort to stem the tide and to relieve itself of the burdens imposed by this mass exodus, Hong Kong entered into a Comprehensive Plan of Action with fifty other nations, including the United States. Developed in 1989, the Plan governs the screening of asylum seekers and provides that those persons not recognized as "refugees" pursuant to international criteria--those who have been "screened out"--must return to Vietnam in order to seek resettlement in a third country.
 
 
 28
 For the moment, Hong Kong and the other "first asylum" countries are exercising forbearance. They are following a program of voluntary repatriation for those who have been "screened out." Hong Kong is, in other words, asking these people to depart voluntarily rather than forcibly expelling them, as it presumably has every right to do since they are there illegally. The head of the State Department's Bureau of Refugee Programs believes that it is "fundamentally important to the success" of the Comprehensive Plan that "Vietnamese in the camps have the clear perception that there is no alternative for the screened out but to return to Vietnam." "[A]nything that clouds that perception or gives birth to rumors that resettlement of the screened out is possible will reduce voluntary repatriation and create a situation in which resort to mandatory repatriation by first asylum governments is made more likely."
 
 
 29
 The potential repercussions of the majority's decision are, to say the least, disquieting. The flight of illegal aliens to Hong Kong and elsewhere has created an international crisis. Fifty nations have sought to avert the flood by stopping the flow. Not processing their visas in Hong Kong removes one of the reasons so many of these people are leaving their homeland and embarking on the dangerous journey across the South China Sea. Now the majority holds that it is illegal for the United States consular office in Hong Kong to abide by the Comprehensive Plan and refuse to process immigrant visas for Vietnamese boat people detained in the camps. Why? Because this is discrimination on the basis of nationality and 8 U.S.C. Sec. 1152 provides, with certain exceptions, that "no person shall ... be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence."
 
 
 30
 But it is not nationality that precludes visa processing. The so-called "discrimination" the majority detects stems from the illegal status of the screened out boat people, rather than from the fact (if it is a fact) that they are all Vietnamese nationals. Compare two Vietnamese nationals in Hong Kong, one there illegally and currently living in a detention camp and the other there legally, perhaps working or on holiday. As implemented, the current regulation allows processing of the legal Vietnamese but not the illegal one. That is not discrimination on the basis of nationality, but discrimination on the basis of legality. And the statute does not forbid it. Still less is the State Department's current regulation a "nationality based regulation," as the majority supposes. The regulation reads:
 
 
 31
 (a) Alien to apply in consular district of residence. Unless otherwise directed by the Department, an alien applying for an immigrant visa shall make application at the consular office having jurisdiction over the alien's place of residence; except that, unless otherwise directed by the Department, an alien physically present in an area but having no residence therein may make application at the consular office having jurisdiction over that area if the alien can establish that he or she will be able to remain in the area for the period required to process the application....
 
 
 32
 59 Fed.Reg. 39,955 (1994) (to be codified at 22 C.F.R. Sec. 42.61). There is not a word here relating to an alien's nationality. Within the United States illegal aliens are treated far differently than those who are legally here. It is beyond belief that distinguishing--that is, discriminating--among visa applicants on the same ground is forbidden. The regulation, through the words "unless otherwise directed," permits the State Department to make this distinction and section 1152 does not forbid it.
 
 
 33
 To show that the State Department was discriminating against the detainees because they were Vietnamese, the majority quotes a statement of the defendants and italicizes two words: "in approximately April, 1993, the Department changed its practice or policy relating to the processing of immigrant visa petitions of Vietnamese nationals residing illegally in Hong Kong." Consider the quotation again, this time without the distracting italics. It indicates that the State Department's policy dealt only with those Vietnamese "residing illegally in Hong Kong." That makes my point, not the majority's. Other Vietnamese in Hong Kong may be processed. What causes the difference in treatment? Not nationality, but the common sense international distinction between aliens who enter a country illegally and those who enter legally.
 
 
 34
 There may be room for an argument that the State Department will process other illegal immigrants--that is, other than the Hong Kong detainees--in foreign countries despite their illegal status, and therefore the Vietnamese boat people are being singled out because they are Vietnamese. But there is no evidence that this sort of thing is going on; and the regulation is so new that I doubt whether any world-wide customary practice under it can yet be discerned.
 
 
 35
 Given the profound consequences of judicial intervention and the danger that a decision might dismantle this carefully wrought international program designed to bring a humane and swift end to the continuing problem of illegal immigration, it is critical that we decide only what we have to decide. The majority has followed another course, which brings me to my second objection. Of the five plaintiffs, two are--or were--screened out Vietnamese residing in one of the Hong Kong camps. The oral argument in this case revealed that these alien-plaintiffs may have already been processed. Their preference numbers came up nearly a year ago. See Kooritzky v. Reich, 17 F.3d 1509, 1510-11 (D.C.Cir.1994). At the time of the district court's decision--April 1994--the State Department was still processing detainees whose visa applications were current, that is, those whose preference numbers had been reached. It therefore appears quite likely that the alien-plaintiffs are now in the United States. If they are, their two sponsors, who are also plaintiffs, have no further interest in the case. The case was never certified as a class action. The district court made no findings regarding the status of the alien-plaintiffs and neither the plaintiffs' nor the government's counsel at oral argument could say whether a live controversy still exists.
 
 
 36
 If the alien-plaintiffs have already received relief, the case could not be saved by qualifying as one capable of repetition but evading review. The capable of repetition part of the formulation means the complaining party is likely to be subjected to the same challenged activity in the future. We so held in Christian Knights of the Ku Klux Klan v. District of Columbia, 972 F.2d 365, 370 (D.C.Cir.1992), citing several Supreme Court decisions on the point. If the individual Hong Kong plaintiffs already had their applications processed, they will not suffer the same fate in the future.
 
 
 37
 Without the aliens or their sponsors in the case, our deciding the merits would be warranted only if the remaining plaintiff, LAVAS, had standing, which it does not. The harm it alleges--a possible future strain on its resources--is general and speculative, see Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); and the organization is not within the zone of interest the statute was meant to protect, cf. INS v. Legalization Assistance Project of the Los Angeles County Fed'n of Labor, --- U.S. ----, ----, 114 S.Ct. 422, 424, 126 L.Ed.2d 410 (1993) (Circuit Justice O'Connor).
 
 
 38
 The proper course therefore should have been to remand the case to the district court to make a finding whether the case is moot. We do not have to be entirely certain the case has become moot; if there is cause to believe it has met that fate, a remand is warranted. That is what the Supreme Court does when it encounters this sort of situation. See, e.g., White v. Regester, 422 U.S. 935, 936, 95 S.Ct. 2670, 2671, 45 L.Ed.2d 662 (1975) (per curiam); Hill v. Printing Indus. of the Gulf Coast, 422 U.S. 937, 938, 95 S.Ct. 2670, 2670, 45 L.Ed.2d 664 (1975) (per curiam); Indiana Employment Security Div. v. Burney, 409 U.S. 540, 541-42, 93 S.Ct. 883, 883-85, 35 L.Ed.2d 62 (1973) (per curiam); Johnson v. New York State Educ. Dep't, 409 U.S. 75, 76, 93 S.Ct. 259, 259, 34 L.Ed.2d 290 (1972) (per curiam) ("[G]iven the suggestion at oral argument ... the case is remanded to the [district court] to determine whether this case has become moot."). And that is what we should have done rather than rushing into the merits.
 
 
 
 [1]
 We do not address the additional threshold question of mootness raised by the dissent because we do not view it as being properly in the case. No party has suggested that the case is moot on the basis asserted by the dissent nor do we understand the dissent to be asserting that the case is moot. The dissent from a reading of the facts determines that the case might possibly be moot and therefore, in the view of the dissent, should have been remanded. Unlike the dissent we find no authority for the proposition that we should remand a case upon our discovery of grounds that might possibly render the case moot. Johnson v. New York State Education Department, 409 U.S. 75, 76, 93 S.Ct. 259, 259, 34 L.Ed.2d 290 (1972) (per curiam), did not involve a suggestion that the case might be moot. The suggestion in Johnson was that the facts were such that the case had in fact become moot. The Supreme Court unremarkably remanded for a determination as to whether the facts were as represented. The suggestion by the dissent in the present case is that the facts may have changed so as to make the case moot after the hearing below. Such a speculative possibility not raised by any party to the case could be asserted in a wide array of cases but has never been the basis of a remand to our knowledge
 
 
 [2]
 We need not distinguish the terms "reside" and "physically present" for purposes of this appeal